799 F.2d 631
 15 Collier Bankr.Cas.2d 617, 14 Bankr.Ct.Dec. 1341,
Bankr. L. Rep. P 71,462
 In re WHITE RIVER CORPORATION, Debtor.
Bruce BERNSTEIN, Trustee in Bankruptcy,
Plaintiff-Appellee-Cross-Appellant,
v.
RJL LEASING, a general partnership,
Defendant-Appellant-Cross-Appellee.
 Nos. 85-1860, 85-1920.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 26, 1986.
 
 Jonathan A. Margolies of Sterling and Miller, P.C., Denver, Colo., for Bruce Bernstein.
 Garry R. Appel of Rothgerber, Appel, Powers & Johnson, Denver, Colo., for RJL Leasing.
 Before McKAY, LOGAN and SEYMOUR, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir. R. 10(e). The cause is therefore submitted without oral argument.
 
 
 2
 The trustee for White River Corporation filed a complaint in bankruptcy court to recover what he claimed were preferential transfers made from White River Corporation to RJL Leasing. That court entered a final judgment of $30,068.05 against RJL, 50 B.R. 403. The district court affirmed the judgment, and both parties appeal.
 
 
 3
 Neither party disputes the pertinent facts. On December 2, 1980, RJL leased a drilling rig to the Dunne-Gardner Joint Venture (consisting of White River Corporation and Dunne-Gardner Petroleum). The lease agreement provided that the lessee pay a security deposit of $23,000 and that monthly rent of $23,000 be paid on the 15th day of each month.
 
 
 4
 The trustee seeks to avoid three payments White River made to RJL under that lease agreement. The first was a check for $46,567.12, payment of the September and October rent plus interest. The check was delivered on October 26, 1981; it actually cleared White River's bank and was paid on November 6, 1981.
 
 
 5
 Shortly after this first check was delivered, on October 30, 1981, RJL and the Joint Venture amended the lease agreement to increase the rent payment to $30,000 per month and to require an additional security deposit of $7,000.
 
 
 6
 The second transfer consisted of a $30,000 check for the November rent. RJL received the check on November 21, 1981; it cleared White River's bank and was paid on December 1, 1981.
 
 
 7
 The third transfer was a $7,000 payment for the increased security deposit. RJL received the check on December 3, 1981; it cleared White River's bank and was paid on December 15, 1981. Shortly after this transfer, White River filed its petition for bankruptcy and made no further lease payments.
 
 
 8
 RJL does not dispute that all of these transfers are preferential under 11 U.S.C. Sec. 547(b) (1982). RJL, however, argues that they are not avoidable because they fall under an exception found in 11 U.S.C. Sec. 547(c)(2) (1982). That section states:
 
 
 9
 (c) The trustee may not avoid under this section a transfer--
 
 
 10
 (2) to the extent that such transfer was--
 
 
 11
 (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 12
 (B) made not later than 45 days after such debt was incurred;
 
 
 13
 (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 
 
 14
 (D) made according to ordinary business terms....
 
 
 15
 It is undisputed that the transfers in question qualified under subsections (A), (C), and (D). Thus, the only issue presented is whether, under subsection (B), the relevant transfers were "made not later than 45 days after such debt was incurred." To resolve that question, we must determine the dates on which the debts were incurred and on which the transfers to RJL were made.
 
 
 16
 The bankruptcy court held that the rental debts were incurred monthly as each rent payment became due. The trustee argues on his cross appeal that the rental debts were incurred on the date the lease was executed, December 2, 1980.
 
 
 17
 Congress did not define when a debt is incurred. However, courts have recognized, in interpreting section 547(c)(2), that a debt is incurred when a debtor first becomes legally bound to pay. See, e.g., In re Iowa Premium Service Co., 695 F.2d 1109, 1111 (8th Cir.1982) (en banc); Barash v. Public Finance Corp., 658 F.2d 504, 512 (7th Cir.1981).
 
 
 18
 We agree with the rationale set forth in In re Mindy's, Inc., 17 B.R. 177 (Bankr.S.D.Ohio 1982), wherein the bankruptcy court, in determining the issues of antecedent indebtedness and the section 547(c)(2) exception, stated:
 
 
 19
 The court declines to follow the rationale advanced by the trustee that the debt was incurred at the time of the original signing of the lease obligations. The total lease obligation, at that point in time, was not due and payable--it was only due and payable as the lease term progressed and as the lessee occupied the premises subject to the leasehold in accordance with the terms of the lease.
 
 
 20
 17 B.R. at 179. Another bankruptcy court applied this rationale to rent payments. In finding a certain rent payment not avoidable, it determined that the debtor did not become indebted for the rent payment until the time the rent was actually due. In re Clothes, Inc., 35 B.R. 489, 491-92 (Bankr.D.N.D.1983). The Eighth Circuit applied this rationale to interest payments, holding that a debt for interest payments is incurred on the date the interest accrues, not the date the note is executed. In re Iowa Premium Service Co., 695 F.2d at 1109. Other courts have used this same timing principle to hold that the "new value" exception under section 547(c)(4) applied to keep lease installments from being avoidable. See In re Quality Plastics, Inc., 41 B.R. 241 (Bankr.W.D.Mich.1984); In re Thomas W. Garland, Inc., 28 B.R. 87 (Bankr.E.D.Mo.1983).
 
 
 21
 We see no reason why the Mindy's rationale should not apply to rental debts incurred under an equipment lease agreement. The 1980 lease clearly delineates that rentals were due and payable on the 15th of each month. Thus, the debt was not incurred when the lease obligation was executed because the total lease obligation was not then due and payable. We hold that the debts were incurred under the lease in monthly increments on the actual dates the rent was due.
 
 
 22
 RJL contends that the actual due date of the lease obligations was on the 25th of each month, not on the 15th, because the lease provides that the lessee will be in default if he fails to make lease payments when due or within ten days thereafter. RJL's contention is without merit. This lease provision merely defines when a default on the rent obligation occurs; it does not determine the date the rent obligation was incurred.
 
 
 23
 Regarding the lessee's obligation for the increased security deposit, it is undisputed that the lessee incurred this debt when the lease agreement was amended, October 30, 1981.
 
 
 24
 To determine the date on which the transfers occurred, we must resolve whether a check is transferred for purposes of section 547(c)(2) on the date it is delivered or on the date it is honored by the drawee bank. If we hold that the date of transfer is the date of delivery, then the trustee may not avoid any of the transfers because, under that definition, they occurred within 45 days of the dates the debts were incurred. However, if we hold that the date of transfer is the date the drawee bank honors the check, then the trustee can avoid the first and third transfers.
 
 
 25
 The trial court held that the trustee could avoid the first and third transfers, determining that the date of transfer is the date the bank honors the check rather than the date of delivery.
 
 
 26
 The many courts that have confronted the issue of when a transfer made by check occurs are split. See In the Matter of Fasano/Harriss Pie Co., 43 B.R. 871, 874-75 (Bankr.W.D.Mich.1984) (discussion of the various approaches taken by courts on this issue). After reviewing both sides of the split, we are persuaded by the First Circuit's analysis in O'Neill v. Nestle Libbys P.R., Inc., 729 F.2d 35, 37-38 (1st Cir.1984). Thus, we hold that a transfer occurs upon delivery of the check.
 
 
 27
 We adopt this view after finding it supported by legislative history, policy considerations and pragmatic concerns. In reviewing the congressional history of section 547(c)(2), we find persuasive the statements of Representative Edwards and Senator DeConcini, respectively the managers in the House and Senate of the bills which ultimately became the Bankruptcy Code of 1978. Both legislators expressly endorsed the delivery date interpretation:
 
 
 28
 Contrary to the language contained in the house report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of section 547(c)(1) and (2).
 
 
 29
 124 Cong.Rec. H 11097 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S 17414 (daily ed. Oct. 6, 1978). Moreover, our interpretation furthers policy objectives behind the enactment of section 547(c)(2). The delivery date view encourages trade creditors to continue dealing with troubled business by insulating normal business transactions from the trustee's avoiding power. See In re Dependable Products, Inc., 51 B.R. 338, 339-40 (Bankr.S.D.Ohio 1985); Fasano/Harriss Pie Co., 43 B.R. at 874-75. Additionally, "in the commercial world receipt of a check, as distinguished from the date it clears the drawee bank, is customarily looked upon as the date of payment of an obligation." Young Supply Co. v. McLouth Steel Corp., 55 B.R. 356, 357 (E.D.Mich.1985). Finally, our holding that the transfer occurs on the date the check is delivered allows the debtor, as opposed to the bank, to determine the precise date of transfer.
 
 
 30
 We also agree with the First Circuit's view that the check must be presented for payment within "the 30-day period deemed reasonable under the U.C.C." and honored upon presentment in order for the delivery date to be considered the time of transfer. O'Neill, 729 F.2d at 38.
 
 
 31
 We reverse the district court and hold that the trustee may not avoid any of the transfers in question.