In re AMERICAN INTERNATIONAL AIRWAYS, INC., Debtor.

Harry P. BEGIER, Jr., Esquire, Trustee, Plaintiff,

v.

KRAIN OUTDOOR ADVERTISING, INC., Defendant.

Bankruptcy No. 84–02379K.
Adv. No. 86–0207K.

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 23, 1986.

Harry P. Begier, Jr., Philadelphia, Pa., Trustee.

Marc N. Bell, Paul J. Winterhalter, Philadelphia, Pa., for plaintiff-trustee.

Pace Reich, Philadelphia, Pa., for debtor.

Arnold E. Cohen, Lauri Siegel, Philadelphia, Pa., for defendant-Krain Outdoor Advertising, Inc.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The facts of this case require us to explore several issues which pervade the numerous proceedings brought before our court, like all bankruptcy courts, to avoid certain pre-petition transfers of a debtor as preferential transfers, pursuant to 11

U.S.C. § 547. The issue presented, and our determinations as to each of them are as follows:

■ (1) When is a debt for an ongoing service to be paid in periodic installments "incurred," per 11 U.S.C. § 547(c)(2)(B), as that Code provision existed prior to the amendments effected by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353 (BAFJA)?

We hold that a debt is incurred upon the earlier of (a) the date of receipt of service by the debtor, pro-rated to estimate the service received within the applicable 45–day period, if necessary; or (b) Any due date established by the parties' contractual relationship;

■ (2) Is a "transfer," per the prior § 547(c)(2)(B) and § 547(c)(4), effected when the debtor delivers a check in payment or when the check is honored? We hold, in interpreting both sections, that a "transfer" occurs upon delivery of a check; and

■ (3) What must a creditor do to successfully defend against a preference, per § 547(c)(4), on the ground that he gave "new value" to the debtor? We hold that, per the "subsequent advance rule" established in this provision, which abrogates the "net result rule" which was created under the Bankruptcy Act, the creditor must show that he provided additional service to the debtor after the date of the alleged preferential transfer.

Applying these holdings to the facts in issue, as set forth hereinafter, we rule as follows: (1) The debts for outdoor advertising in issue were "incurred" as of each date that service was provided, *i.e.*, in March, April, and May, 1984, prorated by the cost of each date of receipt of service; (2) The transfers of the Debtor occurred on the dates of delivery of the checks in issue, June 15, 1984; June 22, 1984; and July 13, 1984, respectively, and hence all dates on which the debts were incurred by the Debtor were outside of the 45–day period set forth in § 547(c)(2)(B) except those rendered on May 30th and May 31, 1984; and (3) The creditor established that it extended, as "new value," service to the Debtor from June 15, 1984, to July 19, 1984, and hence was entitled to set off the Trustee's claim for return of preferential transfers by the value of thirty-four (34) days of service, per § 547(c)(4).

The underlying bankruptcy case was filed by the Debtor, AMERICAN INTERNATIONAL AIRWAYS, INC. (hereinafter "the Debtor"), under Chapter 11 of Title 11, U.S.C., on July 19, 1984. The instant adversarial proceeding was commenced on March 26, 1986, by Harry P. Begier, Jr., Esquire, the Trustee in Bankruptcy for the Debtor (hereinafter referred to as the "Trustee"), seeking to avoid three (3) payments by check made by the Debtor to the Defendant, KRAIN OUTDOOR ADVERTISING, INC. (hereinafter referred to as "Krain"), as being preferential, per 11 U.S.C. § 547(b).[1]

The parties stipulated to facts which establish all of the elements necessary to demonstrate that the Debtor's payments in issue constitute preferential transfers under § 547(b). However, Krain contends that the three (3) payments fell, alternately, within the terms of 11 U.S.C. § 547(c)(2) and 11 U.S.C. § 547(c)(4),[2] and that the

---

1. 11 U.S.C. § 547(b) provides, in pertinent part:

   (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
   　(1) to or for the benefit of a creditor;
   　(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   　(3) made while the debtor was insolvent;
   　(4) made—
   　(A) on or within 90 days before the filing of the petition; ...

   　(5) that enables such creditor to receive more than such creditor would receive if—
   　(A) the case were a case under Chapter 7 of this title.
   　(B) The transfer had not been made; and
   　(C) Such creditor received payment of such debt to the extent provided by the provisions of this title.

2. These provisions, in the form that they existed prior to BAFJA, which apply because the underlying bankruptcy case was filed prior to the BAFJA effective date, were as follows:

Trustee is hence not entitled to avoid these transfers.

A trial of this proceeding took place on August 18, 1986, before the Honorable Emil F. Goldhaber, Chief Bankruptcy Judge of this court, who at that time was hearing all of the cases normally assigned to both Philadelphia judges. Prior to the commencement of testimony, the parties stipulated to certain facts which are incorporated below in our Findings of Fact. This case, being a matter originally assigned to Bankruptcy Judge William A. King, Jr., was transferred to the undersigned when he took the bench on August 27, 1986. On September 5, 1986, we ordered the Plaintiff to arrange for the preparation of the Notes of Testimony and for the parties to thereafter submit Proposed Findings of Fact and Conclusions of Law. They did so on October 6, 1986, and October 15, 1986, respectively.

FINDINGS OF FACT

1. Krain is a Pennsylvania corporation and is a creditor of the Debtor.

2. An agreement was entered into between an agent of the Debtor, Innovative Travel Group (hereinafter "ITG"), and Krain whereby Krain would provide outdoor advertising to the Debtor for three (3) "pair units" and two (2) "fixed units" at certain subject locations for a period of six (6) months, with services commencing January 1, 1984.

3. The only written memorialization of this transaction was a "confirmation" letter of November 18, 1983, from ITG to Krain, a copy of which was entered into evidence as Defendant's Exhibit 1, which did not make any specific reference to when payments would be due for the services.

4. On December 30, 1983, ITG and Krain executed a further contract for an additional location not included in the original agreement, a copy of which was entered into evidence as Defendant's Exhibit 3. (This contract is referred to hereinafter as "the 2nd contract."). This transaction was memorialized by a contract which Krain's President identified as a "standard form" used in the industry. (Transcript of Testimony, August 18, 1986 (hereinafter referred to as "T."), at 35–36, 52–53). This contract states, inter alia, that "we [the Debtor] agree to pay you monthly, in advance," for Krain's service.

5. Since this is the only specific contract form signed by the parties, the terms of this form are found to apply to both of the parties' contracts, i.e., the contract of November 28, 1983, as well as that of December 30, 1983.

6. Pursuant to the agreements, Krain posted advertising for the Debtor during the latter part of December, 1983, and the first few days of January, 1984.

7. In January, 1984, the Debtor expressed dissatisfaction with certain of the advertising provided in the November 28, 1983, agreement.[3]

8. Shortly thereafter, in and around January, 1984, the parties had a number of discussions which modified the terms of the original contract and ultimately culminated in a modified agreement, which, for the purposes of this proceeding, were deemed, in relevant part, as follows:

(c) The trustee may not avoid under this section a transfer—

　.　　.　　.　　.　　.

(2) to the extent that such transfer was—
(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made not later than 45 days after such debt was incurred;
(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(D) made according to ordinary terms; ...

　.　　.　　.　　.　　.

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ...

3. The parties' Stipulation, as transcribed by Krain in its Brief, states that the Debtor expressed dissatisfaction with the advertising in June, 1984, but this is obviously an error.

(a) Krain would provide outdoor advertising space for eight (8) months commencing March 1, 1984, utilizing three (3) of the original sign locations, but substituting certain alternate locations;

(b) No charges would be made for outdoor advertising space provided during the months of January and February of 1984 and outdoor advertising would be provided for eight (8) months, with the first month commencing March 1, 1984, and ending October 30, 1984, but payment would only be made by the Debtor for only six (6) months of the eight (8) months provided;

(c) Invoices previously rendered under the original agreement for the months of January and February, 1984, would be honored by the Debtor, but as pertaining to the months of March and April, 1984, subsequent invoices would be rendered months.

(d) Payment for advertising services would be made for each month of the contract sixty (60) days after the commencement of the month in question.

9. Under the terms of the modified agreement, payment was due on May 1, 1984, for services rendered in March, 1984; on June 1, 1984, for services rendered in April, 1984; on July 1, 1984, for services rendered in May, 1984; and in the same fashion for the three (3) remaining months.

10. The Debtor failed to make any payments to Krain on May 1, 1984, or June 1, 1984, per the modified agreement.

11. Therefore, the Debtor and Krain arranged a meeting between Lawrence Krain, the President of Krain, and Edward T. Lack, Vice-President and Controller of the Debtor, on June 7, 1984.

12. As a result of that meeting, Krain agreed not to follow through with a threat to paint-out, relist and resell the signs which carried advertisements of the Debtor, in exchange for weekly installment payments on the amounts due to Krain. (*T.*, at 48, 50–51).

13. In a letter dated June 11, 1984, a copy of which was admitted into evidence as Exhibit D–4, Lack confirmed that the terms of the June 7, 1984, agreement were that the Debtor's balance due to Krain was $42,-840.00, and that this would be paid in weekly installments of $7,140.00 each, beginning June 15, 1984.

14. On June 15, 1984, the Debtor issued to Krain its check number OV6020 in the amount of $7,140.00, which constituted payment of the invoices dated in January, 1984, in the amount of $5,780.00, for services rendered between March 1 and March 31, 1984, on the initial contract, and $1,360.00 for services rendered on the 2nd contract between January 10, 1984, and February 9, 1984 (hereinafter referred to as "the first check").

15. The first check was honored or paid by the Debtor's bank on or about June 18, 1984.

16. On June 22, 1984, the Debtor issued check number OV6119 in the amount of $5,780.00 to Krain, representing payments against the invoice dated February, 1984, for services rendered during the period from April 1, 1984, through April 30, 1984 (hereinafter referred to as "the second check").

17. The second check was honored or paid by the Debtor's bank on or about June 17, 1984.

18. On July 13, 1984, the Debtor issued check number OV6352 to Krain in the amount of $5,780.00, against the invoice dated March, 1984, for outdoor advertising services rendered during the period from May 1, 1984, through May 31, 1984 (hereinafter referred to as "the third check").

19. The third check was honored or paid by the Debtor's bank on or about July 16, 1984.

20. At the time that the Debtor issued these three (3) checks it was insolvent.

21. These checks constituted payments of debts incurred in the ordinary course of business or financial affairs of the Debtor and Krain.

22. The checks themselves were payments made in the ordinary course of the business or financial affairs of the Debtor and of Krain.[4]

23. At no time prior to July 19, 1984, did Krain know or have reason to know that the Debtor was insolvent. On that date, the Debtor filed a petition under Chapter 11 of Title 11 of the United States Code for Relief under the Bankruptcy Act.

24. Krain's President testified that he provided advertising services to the Debtor "subsequent to their filing" (T., at 51), but, because no date for termination of services is established, the Court has no evidentiary support to conclude that the services continued for any dates after July 19, 1984.

25. Krain's President testified that it was his policy to refund the full payment for a month if anything happened to a sign at any time prior to the end of a month. (T., at 53–54). However, this policy had no effect on the time that payments were due, i.e., in advance of the month in which services were provided.

## CONCLUSIONS OF LAW

1. The requirements to establish preferential transfers by the Debtor here, set forth in 11 U.S.C. § 547(b), were present as to each of the three (3) checks in issue.

2. Because this case was filed prior to the effective date of BAFJA, the version of 11 U.S.C. § 547(c) as it existed prior to the enactment of BAFJA must be applied in this case.

3. The dates that the Debtor effected "transfers" to Krain, for purposes of former § 547(c)(2)(B), were the dates that its three (3) checks were delivered to Krain, i.e., June 15, 1984; June 22, 1984; and July 13, 1984, respectively.

4. The dates that the Debtor "incurred" the obligations for which the three (3) "transfers" described in paragraph three supra were the earlier of (a) the dates that services were received, pro-rated on a daily basis or (b) the due dates for payments pursuant to the parties' modified agreement.

5. In this case, the earlier dates were the dates of receipt of services, and, by pro-rating as indicated above, it is concluded that all of the services except those rendered on May 30 and May 31, 1984, were rendered more than forty-five (45) days before the Debtor's transfers were made to Krain.

6. Krain is therefore able to satisfy the requirement of § 547(c)(2)(B) that payments must be made "not later than forty-five (45) days after such debt was incurred," only as to two (2) of the dates of service, which, prorated on the basis of a $190.03 daily rate,[5] were valued at $380.06. Krain therefore successfully defended this action on the basis of § 547(c)(2) as to $380.06 of the transfers.

7. Krain met its burden of proving that it provided "new value" in the form of additional services to the Debtor from the date of the first preferential transfer of June 15, 1984, until July 19, 1984, per § 547(c)(4).

8. Krain is therefore entitled to offset the preferential transfers to it by the Debtor, on the basis of § 547(c)(4), by the sum of thirty-four (34) days of service, or $6,461.02.

9. The preferential transfers of the Debtor to Krain totalled $18,700.00.

10. The Debtor is entitled to judgment against Krain in the amount of $18,700.00 less $380.06, per § 547(c)(2), plus $6,461.01, per § 547(c)(4), or $11,858.92.

## DISCUSSION

The first issue, and the one to which the parties have devoted by far the most attention, surprisingly from Krain's vantage point, is whether the transfers of the Debtor to Krain were exempted from considera-

---

4. This finding might be questioned, in light of the fact that the modifications in the parties' first contract, as are set forth in paragraph eight (8) supra, require payments be made sixty (60) days after the service were originally payable, which does not seem so "ordinary." However, the parties stipulated to this fact, and we are therefore unwilling to revise it.

5. See page 17 infra for this calculation.

tion of preferential status by the terms of 11 U.S.C. § 547(c)(2). By reason of the stipulated facts, it is undisputed that the three (3) payments in question met the criteria of § 547(b) and those of subsections (A), (C), and (D) of § 547(c)(2). Thus the determinative question, for purposes of ascertaining whether § 547(c)(2) can be successfully invoked by Krain as a defense, is whether, under § 547(c)(2)(B), the three (3) payments were "transferred" within forty-five (45) days of the respective dates that the debts for which they made payment were "incurred."

To determine whether § 547(c)(2)(B) applies, we must determine both when the debts in issue were "incurred," and when the Debtor was deemed to have made "payments" on them. Both of these issues are problematical, and we shall discuss both at some length, because the issues that arise in this matter are recurrent and this analysis may assist in resolving other similar cases in the future.

Our starting point is consideration of the policy of § 547(c)(2), which is " 'to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.' " *Windsor Communication Group v. Freedom Greeting Card Co.*, 63 B.R. 770, 774 (E.D.Pa.1986) (per HUYETT, J.) (quoting House Report Comment, H.R. 595, 95th Cong., 1st Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6329).

The following is the classic statement of when a debt is incurred, for purposes of § 547(c)(2):

> the debt is incurred on the date that the debtor becomes liable for it—when a resource is consumed or a service performed—, not the date that the creditor chooses to bill the debtor. *In re Emerald Oil Co.*, 695 F.2d 833, 837 (5th Cir. 1983).

Five (5) other Circuit Courts of Appeal have unanimously agreed with this interpretation of the Fifth Circuit Court of Appeals. *See In re White River Corp.*, 799 F.2d 631, 632 (10th Cir.1986); *In re Advance Glove Mfg. Co.*, 761 F.2d 249, 250 (6th Cir.1985); *In re Gold Coast Seed Co.*, 751 F.2d 1118, 1119 (9th Cir.1985); *In re Iowa Premium Service Co.*, 695 F.2d 1109, 1111 (8th Cir.1982); and *Barash v. Public Finance Corp.*, 658 F.2d 504, 509 (7th Cir. 1981). This court has, not surprisingly, followed the rule established in *Emerald*. *See In re Naudain*, 32 B.R. 875, 879, and 32 B.R. 871, 874 (Bankr.E.D.Pa.1983) (per GOLDHABER, CH. J.).

Special difficulties arise when a contract exists which provides that certain payments must be made by a certain date or time, and when the service provided to the debtor is ongoing. Both of these elements are present here.

As *Emerald* makes clear, the courts refuse to allow the creditor to choose the date that the debt is incurred by when it chooses to invoice or bill the debtor for its services. 695 F.2d at 837. However, in *White River, supra*, in considering a lease arrangement, the court, while rejecting the notion that *all* of the rent debt is incurred when the lease is signed, states that "the debtor did not become indebted for the rent payment until the time the rent was actually due." 799 F.2d at 633. In *Advance Glove, supra*, the court holds that "the debt for the insurance premiums was incurred on the first day of each month—the day payment was due under the express language of the insurance policy." 761 F.2d at 250. *See also In re Mindy's, Inc.*, 17 B.R. 177, 179 (Bankr.S.D.Ohio 1982).

The issue of ongoing service is most difficult to resolve in the numerous cases involving utility services. The majority of those cases hold that the debt is incurred as soon as the service is used, not when the service is billed or even when the meter is read by the utility. *See Barash, supra*, 658 F.2d 509–10; *In re Keydata Corp.*, 37 B.R. 324, 327 (Bankr.D.Mass.1983); and *Naudain, supra*, 32 B.R. at 874. *But see In re Georgia Steel, Inc.*, 38 B.R. 829, 835 (Bankr.M.D.Ga.1984); and *In re Garland,*

19 B.R. 920, 928 (Bankr.E.D.Mo.1982) (debt incurred when meters read).

After due consideration of the foregoing authorities, we believe that the proper rule to determine when a debt is incurred is to measure from the earlier of the date when services are provided or when the parties' contract calls for payment. All of the cases express the general principal that the parties cannot set a later date on the time that the debt is incurred by contract, and, as the cases uniformly state, to so hold would be to allow the creditor to manipulate the circumstances to its benefit. However, if the parties agree to set an *earlier* date than that by which the services are supplied as the date that the debt is incurred, such as the agreement that rent is due on the first of the month accepted by the court in *Advance Glove* as the date that monthly rentals are incurred, there is no reason not to give such terms effect. We do note that this conclusion is somewhat inconsistent with the result reached by the court in *White River* that a rent debt is incurred on the fifteenth day of the month, when half of the services for the month had already been rendered. However, we believe that it is the result most consistent with the general principle to which all of these cases purport to subscribe.

The utility cases do present a problem not presented by the rental cases, because use of utility services cannot be so accurately pro-rated as rentals. We believe that, if we were faced with the utility situation, we would nevertheless still attempt to pro-rate the usage by computing a daily rate from average billings and hence, to the best of our ability, estimate the value of services for which a billing debt was "incurred" by the crucial date.

In the instant rental situation, it is relatively easy to pro-rate the rentals due. The daily rental rate, computed by multiplying the monthly rental rate of $5,780.00 by twelve (12) and dividing by three hundred and sixty-five (365), is $190.03, and that is the figure which we shall utilize in our calculations.

In the instant case, as we find, at Finding of Fact 5, *supra*, the only contract setting forth the terms of payment, and hence the terms which we deem significant here, dictated that payments must be made "monthly, in advance." We do agree, however, that the parties' negotiations in January, 1984, had the effect of setting back the dates that the debts arising from all but the 2nd contract would ordinarily have been considered to have been incurred by sixty (60) days. Therefore, the three (3) payments in issue, being for services incurred in March (except for $1,360.00 payable for January services on the 2nd contract), April, and May, respectively, were not due until May 1, 1984 (except, again, for the $1,360.00 payment on the 2nd contract), June 1, 1984, and July 1, 1984.

However, this conclusion is not of great practical help to Krain's case. The services were provided during March, April, and May, and therefore, utilizing the earlier of the dates that services were provided or that the parties' contract required payment, obliges us to utilize the dates that services were provided as our reference point here.

The services paid for by the first check were rendered in March, much greater than forty-five (45) days before the mid-June date that the first check was drawn. The services paid for by the second check were rendered in April, which was also clearly forty-five (45) days before this check was delivered or paid. However, the third check, paying for services rendered between May 1, 1984, and May 31, 1984, was delivered on July 13, 1984, and honored on July 16, 1984. This requires us to consider whether "payment," for purposes of § 547(c)(2), is made upon the delivery of a check or the honoring of the check. If we use the date honored, all of the services rendered in May were incurred more than forty-five (45) days prior to the date of payment. Meanwhile, if our reference point is the delivery-date, the services rendered on May 30 and May 31 were within the forty-five (45) day period.

On this issue, we must distinctly part company with the Trustee and agree with Krain. While there is some split of authority on the point, the vast majority of cases, as well as reason, supports the conclusion that the date of *delivery* of a check must be considered as the date of transfer for purposes of § 547(c)(2).

A profitable starting point is notation of a case which, ironically, the Trustee cites in support of his position on this issue, *In re Fasano/Harriss Pie Co.*, 43 B.R. 871 (Bankr.W.D.Mich.1984). That case *does* hold that the date of honor of a check controls *for purposes of § 547(b)*, *id.* at 873–874; however, it also holds that, because the policy concerns underlying § 547(b) and § 547(c) are very different, the date of *delivery* of a check controls for purposes of § 547(c)(2), as well as § 547(c)(4). *Id.* at 876.

*Fasano/Harriss* is a profitable starting point because it discusses three (3) lines of cases, utilizing different reasoning, which have emerged, the first two (2) of which conclude that payment takes place upon delivery for purposes of § 547(c)(2) and the third of which posits that the date of honoring of the check is the proper referrent. The court, in *Fasano/Harriss*, then posits a fourth basis of reasoning which supports the conclusion that the delivery date controls.

The first line of cases cites to the following statements made by the floor managers of the House (Representative Edwards) and Senate (Senator DeConcini), as a part of a joint explanatory statement on the application of § 547(c)(1) and § 547(c)(2) in the agreed upon compromise bill:

> Contrary to language contained in the House Report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2). 124 Cong.Rec. § 17414 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini); 124 Cong.Rec. H11097 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards).

The second line of cases relies upon a reference to 11 U.S.C. § 547(e)(2), which requires a relation back to the date of delivery only if the check is honored within ten (10) days of delivery.

Finally, the third line of cases, dissenting from the conclusion of the first two (2) lines, reasons that, since there is an absence of legislative history to support the treatment of § 547(c)(2) and (c)(4) in the same fashion as § 547(c)(1), where almost all known cases agree that the date of delivery controls, " 'if Congress had intended to treat a check for the purpose of § 547(c)(2) other than as a credit transaction, if would have so stated.' *In re Advance Glove Mfg. Co.*, 25 B.R. 521, 527 (Bankr.E.D.Mich.1981) [*rev'd*, 761 F.2d 249 (6th Cir.1985) ]. *See also In re Naudain, Inc.*, 32 B.R. 871 (Bankr.E.D.Pa.1983)." *Id.* at 875.

Rejecting all of these lines of reasoning, *Fasano/Harriss* reaches the result that the date of delivery is significant because it is "in the normal course of affairs" to accept a check in payment 43 B.R. at 876.

While we agree that the line of reasoning accepted by the *Fasano/Harriss* court is sound and totally consistent with the reasoning of our local district court in *Windsor, supra*, regarding the underlying purpose of § 547(c)(2), to which we are mandated to give great deference, we disagree with the conclusion by the court in *Fasano/Harriss* that the first line of reasoning should be rejected.

Rather, our examination of the complex trail of legislative history leads us to agree with the conclusion of the first line of cases that the legislative history of § 547(c)(1) explicitly directs that payment by a check is the equivalent of cash, unless dishonored, and that hence payment by a duly-honored check is considered to be made when the check is delivered. We do join the *Fasano/Harriss* court in rejecting the analysis of the second and third line of cases. We agree that § 547(e)(2) addresses only secured transactions and is not meant to have any bearing on transactions like

the unsecured transactions in issue here. We must reject the third line of cases, and the contrary result they reach, because we find, contrary to these cases, that there *is* legislative history directly pertinent to § 547(c)(2). We therefore shall focus on the issue of legislative history at some length hereafter.

In this analysis, we must start with the Report of the Committee of the Judiciary, House of Representatives, H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977) (hereinafter cited as "House Report"). The House Report accompanied the bill which eventually came to be enacted as the Bankruptcy Reform Act of 1978, and the purpose of the House Report was to explain the bill's purpose and meaning, as set forth in the following passage in 2 COLLIER ON BANKRUPTCY APPENDIX II–1 to II–2 (15th ed. 1986):

> The Report is an indication of what the authors of the bill had in mind when drafting it, what the Committee had in mind when reporting it favorably, and what the Members of the House had in mind when approving the legislation.... It does not, of course, reflect any subsequent developments in the legislative process.

What is significant and what apparently has been misunderstood by the cases refusing to accept the analysis of the first line of cases, is that the statement by Representative Edwards and Senator DeConcini is the most recent and reliable joint explanation, coming from the Managers of both Houses, which takes into account the compromises that were reached and the interpretations of the new language of the amended bill. In 3 COLLIER ON BANKRUPTCY APPENDIX, *supra*, at IX–I, it is said of such a passage: "It is similar in function and purpose to the Joint Explanatory Statement of Managers that accompanies a formal Conference Report of a Committee of Conference, and its effect should be the same." *Id. See Young Supply Co. v. McLouth Steel Corp.*, 55 B.R. 356, 357 (E.D.Mich.1985).

The following excerpt is particularly instructive to this endeavor:

> The best method of using the legislative history to aid in interpretation is to begin with the most recent statement of authority and delve backward through the legislative process. Thus the following authorities should be consulted in this order:
>
> 1. floor statement of Congressman Don Edwards, October 6, 1978, on final passage of H.R. 8200;
> 2. floor statement of Senator DeConcini, October 5, 1978, on passage of the final Senate amendment in the nature of a substitute to H.R. 8200;
> 3. floor statement of Congressman Don Edwards, September 28, 1978, on passage of the House Amendment to the Senate amendment in the nature of a substitute to H.R. 8200;
> 4. floor statement of Senator DeConcini, September 7, 1978, on initial passage of the Senate amendment in the nature of a substitute to H.R. 8200;
> 5. Senate Report of the Finance Committee to accompany S. 2266 filed by Senator Long on August 10, 1978;
> 6. Senate Report of the Judiciary Committee to accompany S. 2266 filed by Senator DeConcini on July 14, 1978;
> 8. floor statement of Congressman Don Edwards, October 27, 1977, on consideration of H.R. 8200;
> 9. House Report of the Judiciary Committee to accompany H.R. 8200 as reported filed by Congressman Don Edwards, September 8, 1977....
>
> .    .    .    .    .
>
> ... In any event it is important to remember that only the statements listed in items one and two above refer to the new bankruptcy law as enacted. Every other source, items three through nine, interprets an earlier version of the final legislative product. K. Klee, *Legislative History of the New Bankruptcy Code*, 54 THE AMERICAN BANKR.L.J. 275, 294–95 (1980) (footnotes omitted).

Klee then goes on to state as follows:

> When step one or two of the legislative history contains an explanation, it is a

mistake to rely unquestionably on legislative history from step eight or nine because the language of the statute may have been amended. Stated in a different way, the more recent legislative history is usually more accurate than the older history in describing the code. *Id.* at 296.

Thus, we conclude that the statement made by both Representative Edwards and Senator DeConcini is extremely significant in interpreting § 547(c)(2), and we conclude that it is a most reliable basis for supporting our conclusion that the date of delivery of a check is the significant date for establishing "payment" under that Code section.

As was noted in *Fasano/Harriss, supra,* at 876, "§ 547(c)(1), (c)(2) and (c)(4) are all designed to encourage creditors to deal with a failing business and to protect ordinary business transactions." For example, creditors could disrupt the normal business relations by requiring payment by cash or certified check, or by requiring security at the time when an ailing business cannot tolerate additional constraints or problems. This policy of protecting ordinary business transactions is fundamentally different from the policy underlying § 547(b), which is to promote equality of distribution among creditors and to discourage creditors from racing to the courthouse to dismember a failing debtor. H.R.Rep. No. 595, 95th Cong., 2d Sess. 177–78, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6138; Comment, *Timing of Payments By Check Under § 547 of the Bankruptcy Code,* 7 CARDOZO L.REV. 887, 902 (1986) (hereinafter referred to as "Cardozo Comment"). Hence, it is not inconsistent to conclude that, although the date that a check is honored may be the proper date to consider for purposes of determining when a transfer is made for purposes of § 547(b), the date of delivery of the check is the appropriate date to consider in determining when a transfer is made for purposes of all of the sections of § 547(c).

Furthermore, our conclusion is supported by the vast weight of authority, including the only two (2) Court of Appeals decisions

to address the issue. *See White River, supra,* 799 F.2d at 633; and *O'Neill v. Nestle Libbys P.R.,* 729 F.2d 35, 37–38 (1st Cir.1984). *See also, e.g., In re Downs,* 65 B.R. 1, 2 (Bankr.E.D.Tenn.1985); *In re Chase & Sanborn Corp.,* 51 B.R. 736, 738 (Bankr.S.D.Fla.1985); *In re Transpacific Carriers Corp.,* 50 B.R. 649, 651 (Bankr.S. D.N.Y.1985); *In re Saco Local Dev. Corp.,* 25 B.R. 876, 879 (Bankr.D.Me.1982); and *In re Garland, supra,* 19 B.R. at 928.

We have discussed this subject at some length because the result which we have reached is at variance with that reached by Chief Judge Emil F. Goldhaber of this court, while sitting in New Jersey in *In re Staveco Electrical Construction, Inc.,* 48 B.R. 247, 249 (Bankr.D.N.J.1985); and in this court in *Naudain, supra,* 32 B.R. at 874. With all due respect, we believe that Judge Goldhaber was erroneously influenced by the notion that a ruling that a check only constituted payment upon its being honored for purposes of § 547(b), which he concluded in *In re Ardmore Sales Co.,* 22 B.R. 911 (Bankr.E.D.Pa.1982), required the same conclusion for purposes of § 547(c)(2). However, we do note that Judge Goldhaber concluded that a check constituted payment upon delivery for purposes of § 547(c)(1), *see Staveco,* 48 B.R. at 249–50, and for purposes of § 547(c)(4). *In re Philadelphia Light Supply Co.,* 33 B.R. 734, 738–39 (Bankr.E.D.Pa.1983). Once again, as the Cardozo Comment cited above accurately points out, 7 CARDOZO L.REV. at 902, there are very different goals and policies involved in § 547(b) as opposed to § 547(c)(2). Section 547(b) was "designed to promote the goal of equality among creditors and to discourage a race to the courthouse on the eve of bankruptcy," while § 547(c)(2) was "created to encourage creditors to conduct business with financially ailing debtors by insulating certain ordinary-course transfers from the trustee's avoiding powers."

On the other hand, there is no perceptible difference between the policies contained in the various sections of § 547(c). It is submitted that all were promulgated to protect

creditors who provided new services and/or credit to debtors on the brink of bankruptcy ((c)(1)), who dealt with debtors in the ordinary course of business ((c)(2)), or who gave new value in exchange for payments ((c)(4))). We can therefore perceive of no policy reason for distinguishing the effect of payment by check for purposes of § 547(c)(1) and § 547(c)(4) from the effect of such payment for purposes of § 547(c)(2), as does Judge Goldhaber.

Our agreement with Krain that, for purposes of § 547(c)(2), it is the date of delivery of a check by a debtor which constitutes payment causes us to conclude that some of the debt incurred by the Debtor for Krain's services in May, 1984, is within the 45–day period of the payment of the third check, since it was delivered on July 13, 1984. However, this conclusion, coupled with our holding that the debt is incurred for services when the services are used and that the cost of services provided must be pro-rated per the applicable daily rate, causes us to conclude that only the debt incurred for services on May 30 and May 31, 1984, are within the scope of § 547(c)(2)(B), and hence are protected by § 547(c)(2). At the daily rate of $190.03 which we computed at page 12, *supra,* the result is that § 547(c)(2) provides a defense for only $380.06 of the Trustee's claim.

It is now necessary that we turn to analysis of the application of § 547(c)(4) to the facts at hand. Even if we cannot agree with Judge Goldhaber's decisions in *Staveco* and *Naudain* as to the effect of the delivery of a check for purposes of § 547(c)(2), we do agree with his conclusions in *Philadelphia Light Supply,* that, for purposes of § 547(c)(4), the date of delivery of a check constitutes "payment." Therefore, we will measure the date of transfer, for purposes of § 547(c)(4), from the date of the delivery of the Debtor's checks to Krain. *See also In re Gold Coast Seed Co.,* 30 B.R. 551, 553 (9th Cir. Bankr.App.1983).

Analysis of § 547(c)(4) is made difficult by two (2) factors. First, as the court observes in *In re Paul Saker & Co.,* 53 B.R. 630, 634 (Bankr.S.D.N.Y.1985), the language of this section is "tortured" by the presence of not a double, but a *triple* negative, in § 547(c)(4)(B) (the trustee may *not* avoid a transfer in which the debtor did *not* make an otherwise *unavoidable* transfer for the creditor's benefit). Secondly, the history of this section is marred by the development of a judicially-created doctrine known as the "net result rule" in the interpretation of a comparable rule of law developed under the Bankruptcy Act. Application of the "net result rule" caused the courts to set off new value provided by the creditor over the entire pre-petition preference period against preferential payments by the debtor to the creditor in this period, unless the debtor could establish that the creditor knew or had reason to know of the debtor's insolvency prior to providing the "new value." *See* 4 COLLIER ON BANKRUPTCY, ¶ 547.40, at 547–128 to 547–133. As Collier points out, the consequences of this rule frequently caused recoveries in preference actions to turn on the element of "the creditor's belief in the debtor's solvency." *Id.,* at 547–132. This caused the "net result rule" to work *against* its ostensible policy of encouraging creditors to deal with distressed debtors, since the rule did *not* apply where the creditor was aware of the debtor's insolvency. This is contrary to the public policy of encouraging parties to provide new value to known-distressed debtors.

Happily, the courts which have interpreted § 547(c)(4) have eased the difficulties presented by each of these factors by holding that the Code provisions did away with the "net result rule" and replaced it with a "subsequent advance rule," which is simply stated as "foreclos[ing] avoidance of the transfer by the trustee ... if the creditor provides additional value after the transfer from the debtor to the creditor." *In re Fulghum Construction Corp.,* 706 F.2d 171, 173 (6th Cir.1983). *See also, e.g., In re Wadsworth Bldg. Components, Inc.,* 711 F.2d 122 (9th Cir.1983); *Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248 D.Me. 1984); *In re American International Airways, Inc.,* 56 B.R. 551 (Bankr.E.D.Pa.

1986) (per KING, J.); *In re Telecommunication Services, Inc.,* 55 B.R. 83 (Bankr.E.D.Mo.1985); and *In re Quality Plastics, Inc.,* 41 B.R. 241 (Bankr.W.D.Mich.1984).

Thus, in interpreting § 547(c)(4), we must look not to the net result of the dealings between the parties over the 90–day preference period, but only to the extent of value given by the creditor after the otherwise preferential transfer was made by the debtor. The thicket of triple negatives in § 547(c)(4)(B) is not so forbidding either, when the section is restated by cancelling two (2) of them; it merely requires that, in exchange for the new value, the debtor must have made a transfer which otherwise would have been avoidable. Thus, the creditor can set off against a claim of a preferential transfer the value of whatever he has given to the debtor after the debtor's transfer, where the transfer proves to be illusory because it is ultimately set aside as preferential. Thus, § 547(c)(4) is eminently fair, and protects creditors who deal with financially unstable businesses and reasonably rely on their payments as a consideration for providing these future services.

We hold that § 547(c)(4) applies here to provide Krain with a partial offset against the avoidance of all of the checks given as preferential transfers. Consistent with the "subsequent advance rule," we can only measure Krain's new value from the date of delivery of the first of the Debtor's checks which otherwise constituted preferential transfers forward. Thus, the starting date for measurement is June 15, 1984.

Somewhat unfortunately for Krain, the burden is clearly upon it to establish the elements of § 547(c)(4), and hence to establish the period for which new value was given. *See In re Richter & Phillips Jewelers & Distributors, Inc.,* 31 B.R. 512, 515 (Bankr.S.D.Ohio 1983); and *Saco, supra,* 25 B.R. at 878. While, in its Brief, Krain *argues* that it continued to provide services "until after August 1, 1984," in fact its President testified only that services were provided until an unspecified date "subsequent to" the bankruptcy filing on July 19,

1984. Moreover, even had Krain undertaken to prove that it provided services after the filing date, there is considerable question as to whether post-petition services or advances can be utilized to set off pre-petition preferential transfers, as an estate, separate and apart from the prepetition debtor, is established upon the bankruptcy filing. *See In re Bellanca Aircraft Corp.,* 56 B.R. 339, 396–97 (Bankr.D.Minn. 1985).

Therefore, we believe that Krain has stated a defense pursuant to § 547(c)(4) for the thirty-four (34) day period from June 15, 1984, to July 19, 1984, after the first of the Debtor's preferential transfers. This provides it with an offset of $6,461.02, computed on the daily rate of $190.03 introduced above. Added to the $380.06 arising from its § 547(c)(2) defenses entitles it to a total offset of $6,841.08 against preferential payments totalling $18,700.00. We therefore shall, in an accompanying Order, award the Trustee judgment in the amount of the difference, i.e., $11,858.92.