**In re LADERA HEIGHTS COMMUNITY HOSPITAL, INC., Debtor.**

**The SUCCESSOR COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS, Plaintiff,**

v.

**BERGEN BRUNSWIG DRUG COMPANY, Defendant.**

**Bankruptcy No. LA 90–03504–LF. Adv. No. 92–01555.**

United States Bankruptcy Court, C.D. California.

April 5, 1993.

Michael S. Kogan, UnJu Paik, David B. Zolkin, Arter, Hadden, Lawler, Felix & Hall, Los Angeles, CA, for Successor Committee of Creditors Holding Unsecured Claims.

Arthur L. Rolston, Lande and Rolston, Los Angeles, CA, for Bergen Brunswig Drug Co.

## OPINION RE CROSS–MOTIONS FOR SUMMARY JUDGMENT

LISA HILL FENNING, Bankruptcy Judge.

## I. INTRODUCTION

Until the eve of the filing of an involuntary Chapter 7 petition on February 14,
1990, debtor Ladera Heights Community Hospital, Inc. operated the Marina Hills Hospital in Los Angeles. After entry of a consensual order for relief, the case was converted to Chapter 11. A liquidating plan confirmed in early 1992 gave the Successor Official Unsecured Creditors Committee ("Committee") authority to pursue preference litigation against hospital suppliers who had received payments during the 90–day preference period. This adversary proceeding against creditor Bergen Brunswig Drug Company ("Bergen") is one of the more than 30 such proceedings instituted by the Committee.

Both parties moved for summary judgment. All elements of the Committee's *prima facie* preference action are undisputed. The only issue is whether the pattern of debtor's continuing payments and Bergen's continuing shipments of medical supplies establish either an "ordinary course" or a "subsequent new value" defense under Sections 547(c)(2) and (4) of the Bankruptcy Code.[1] This Court holds that the payments here were not made in the ordinary course, but that Bergen's "new value" constitutes a defense to recovery of all but a small portion of the payments received.

## II. FACTUAL BACKGROUND

While the hospital was operating, Bergen shipped drugs and provided pharmaceutical services to the debtor on an "open book account" basis, with invoices payable "net 10 days." At the beginning of the 90–day preference period, Bergen had an unpaid balance of $42,797.17. The debtor was making regular, but late payments, having been substantially in arrears for some period before that. This pattern continued until the bankruptcy filing. Bergen is now an unsecured creditor of the estate holding a claim for $44,541.96, reflecting the unpaid balance on the petition date.

## III. DISCUSSION

The Committee's complaint seeks recovery of $76,944.93 in prepetition payments

---

**1.** All statutory references are to the Bankruptcy     Code, 11 U.S.C., unless otherwise noted.

made to Bergen within the 90–day preference period. Bergen acknowledges that the Committee has established by undisputed evidence all material elements of a preferential transfer under Section 547(b).[2] Debtor's payments were made on account of an antecedent debt within 90 days of the petition while the debtor was insolvent. In addition, Bergen's prepetition receipts exceed the amount it would receive under a Chapter 7 liquidation. The estate only has approximately $300,000 available to pay administrative and unsecured claims exceeding $4,500,000, yielding a less than 10% return.

■ Bergen raises two defenses. First, it asserts that the payments were made in the ordinary course of business and, as such, are protected from recapture by Section 547(c)(2).[3] Examination of the course of payments, however, demonstrates that the payments were not being made within 10 days, as required under the terms of the invoices. As Bergen notes, payment was made on average 15 days after each shipment, but a comparison of the amounts invoiced for each shipment with the amounts paid shows that the payments were on account of invoices at least two or three shipments old, not for the most recent shipment. Bergen has not met its

statutory burden of proof on the "ordinary course" defense. *See* 11 U.S.C. § 547(g).

■ Bergen's second defense is that its continuing shipments constitute "new value" sufficient to preclude recovery by the Committee by application of Section 547(c)(4).[4] Effectively conceding during argument the existence of a partial defense, the Committee nevertheless argues that this defense is available only if the creditor has provided post-preference value that is unsecured and remains unpaid.

### A. *The Subsequent Advance Rule.*

Under Sections 60(a) and (c) of the Bankruptcy Act of 1898 (the "Act"), preference actions seeking recovery of payments made on open accounts were governed by the judicially-created "net result" rule. This rule allowed the creditor to net all transfers made to the debtor during the preference period against all payments by the debtor without regard to their timing. Thus, if a creditor made a shipment early in the preference period, then received several payments on account, the value of that shipment could be offset against the later payments, even though the debtor received no further benefit from having made the payments. *See* 4 *Collier on Bankruptcy* ¶ 548.12 at p. 547–57 (15th ed. 1992).

---

**2.** Section 547(b) provides as follows:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

**3.** Section 547(c)(2) provides as follows:

(c) The trustee may not avoid under this section a transfer—
(2) to the extent that such transfer was—
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms;

**4.** Section 547(c)(4) provides as follows:

(c) The trustee may not avoid under this section a transfer—
(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
(A) not secured by an otherwise unavoidable security interest; and
(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

The Ninth Circuit has held that the "net result" rule did not survive enactment of the Bankruptcy Code. *In re Wadsworth Bldg. Components, Inc.*, 711 F.2d 122, 124 (9th Cir.1983). It has not, however, directly addressed the question of what standard now applies under the Code's preference provisions contained in Section 547(c)(4). The four circuits that have reached this question uniformly endorse what has become known as the "subsequent advance" rule, most effectively articulated in *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982). *See In re Meredith Manor, Inc.*, 902 F.2d 257, 259 (4th Cir. 1990); *In re Jet Florida System, Inc.*, 841 F.2d 1082 (11th Cir.1988); *In re Prescott*, 805 F.2d 719, 728 (7th Cir.1986); *In re Fulghum Const. Corp.*, 706 F.2d 171 (6th Cir.1983). The "subsequent advance" rule has also been adopted within the Ninth Circuit by the two reported decisions addressing the issue. *In re Gold Coast Seed Co.*, 30 B.R. 551, 553 (BAP 9th Cir.1983); *In re IRFM, Inc.*, 144 B.R. 886 (Bankr. C.D.Cal.1992).

*Garland* considered whether Section 547(c)(4) constituted a codification of the judicially-created "net result" rule or whether Congress intended a modification instead. *Id.* at 922–26. Developed to ameliorate the Act's harsh treatment of creditors who had maintained open accounts with debtors, the "net result" rule gave creditors an offset for any shipments they made to the debtor during the preference period.

The court in *Garland* carefully examined the legislative history and language of Section 547 as well as the net result rule's application under the Act. As *Garland* notes, the legislative history in the House of Representatives purports to incorporate the net result rule:

> The fourth exception [547(c)(4)] codifies the net result rule in section 60c of current law. If the creditor and debtor have more than one exchange during the 90–day period, the exchanges are netted out according to the formula in paragraph four.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 374, *reprinted in* [1978] U.S.Code Cong. and Admin.News 5787, 6330; S.Rep. No. 95–989, 95th Cong., 2d Sess. 88, *reprinted in* [1978] U.S.Code Cong. & Admin.News 5874.

The **"formula in paragraph four"** (*i.e.*, the statutory language of Section 547(c)(4) as enacted), however, contains explicit timing requirements absent from the "net result" rule. It specifies that the new value provided by the creditor must come *after* the transfer by the debtor, a brand-new requirement. Its inclusion in the statute belies any suggestion that Section 574(c)(4) directly codified that rule. This material difference in the language of Section 547(c)(4) means that only the spirit of the "net result" rule survived the enactment of the Bankruptcy Code. *See Garland, supra*, 19 B.R. at 925–28.

**B.** *Subsequent Advance Rule Does Not Require New Value to Remain Unpaid.*

As summarized in *In re IRFM, Inc., supra*, 144 B.R. at 892, three basic principles governing interpretation of Section 547(c)(4) can be derived from *Garland:*

> First, § 547(c)(4)'s subsequent advance rule makes preferential transfers avoidable until offset by *subsequent* advances of new value. Second, Congress drafted § 547(c)(4) to retain the net result rule's policy of encouraging creditors to continue doing business with troubled debtors by protecting transfers received by creditors from preference actions to the extent goods provided by such creditors replenish the estate during the preference period. Third, § 547(c)(4)(B) does not require new value to remain unpaid, but rather acts only as a safeguard against double counting.

Disputing *Garland's* third principle, the Committee contends that Section 547(c)(4) *does* require that new value remain unpaid. The Ninth Circuit has not addressed this issue. The three circuits that have directly ruled are split: the Seventh and Eighth Circuits require the new value to remain unpaid, *In re Kroh Bros. Dev. Co.*, 930

F.2d 648, 652–53 (8th Cir.1991); *In re Prescott, supra,* 805 F.2d 719, 728 (7th Cir. 1986), while the Fourth Circuit does not, *In re Meredith Manor, Inc., supra,* 902 F.2d. 257, 258–59 (4th Cir.1990). None of these cases, however, provides a detailed analysis of the issue, instead simply treating the proposition as well-established.[5] The majority of lower court decisions adopt, without much discussion, the view that the new value must remain unpaid. *See, e.g., In re Formed Tubes, Inc.,* 46 B.R. 645, 646–47 (Bankr.E.D.Mich.1985); *In re Keydata Corp.,* 37 B.R. 324, 328 (Bankr.D.Mass. 1983); *In re Saco Local Dev. Corp.,* 30 B.R. 870, 872 (Bankr.D.Me.1983); *In re Bishop,* 17 B.R. 180, 183 (Bankr.N.D.Ga. 1982). The trend of more recent cases, however, is in the opposite direction: holding that new value need *not* remain unpaid based upon exhaustive analysis of the underpinnings of the legislative and statutory framework. *See, e.g., In re IRFM, Inc., supra,* 144 B.R. 886, 892–93 (Bank.C.D.Cal. 1992); *In re Check Reporting Services, Inc.,* 140 B.R. 425, 432 (Bankr.W.D.Mich. 1992). These cases follow the earlier minority rule of *In re Paula Saker & Co.,* 53 B.R. 630, 634 (Bankr.S.D.N.Y.1985), and *In re Isis Foods, Inc.,* 39 B.R. 645, 653 (W.D.Mo.1984).

This Court finds most persuasive the cogent analysis set forth by Bankruptcy Judge John Ryan of this district in *In re IRFM, Inc., supra,* which builds upon the review and analysis set forth in *Check Reporting,* among other cases, in concluding that new value need not remain unpaid. In the *IRFM* preference action, the Chapter 7 trustee argued, as the Committee argues here, that the creditor's assertion of a Section 547(b)(4) new value defense required that the new value remain unpaid. Judge Ryan rejected that argument, relying on *Garland's* extensive review of the legislative history of Section 547(c)(4)(B) as well as the plain language of the statute itself. *Id.* at 890–93. As *IRFM* observed, the plain language of Section 574(c)(4) contains no requirement that new value must remain unpaid. *Id.* at 890. The legislative

history of Section 574(c)(4) is equally devoid of language imposing such a requirement. Most telling, however, is the fact that Congress deleted the restrictive language of former Section 60(c) which limited the new value exception to "the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy." As *IRFM's* analysis demonstrates, authority for the majority opinion is based almost exclusively on an "inaccurate and confusing paraphrase of the clearly stated statutory exception." *Id.* at 892, n. 16, *citing In re Isis Foods, Inc., supra,* 39 B.R. 645, 653 (W.D.Mo.1984).

Practical considerations also support the *IRFM* result. The exceptions to the preference laws are designed and intended to encourage creditors to continue doing business with debtors who are struggling to keep making payments. Penalizing creditors in a subsequent bankruptcy case for having continued to do business with such a debtor on a regular open account basis will undoubtedly discourage the very behavior that the preference exceptions purport to seek. Creditors are likely to cut off shipments to the debtor, destroying workout possibilities and forcing more debtors to file bankruptcy. The effect of the majority interpretation is that it "will cause creditors to abandon debtors in need." *IRFM, supra,* 144 B.R. at 893.

### C. *Offset Credit for New Value Shipments Should Not be Limited to the Immediately Preceding Payment.*

Finally, this Court rejects Bergen's assertion that the minority rule promulgated in *Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248 (D.Me.1984), is the appropriate standard for Section 547(c)(4) defenses to preferential transfers. *Leathers* allows setoff only up to the value of the transfer immediately preceding the infusion of new value. This approach has been criticized for its arbitrary refusal to allow setoff against earlier transfers. *See In re Meredith Manor, Inc., supra,* 902 F.2d 257, 259 (4th Cir.1990) (commercial realities

---

5. The Third Circuit in *In re New York City Shoes, Inc.,* 880 F.2d 679, 680–81 (3d Cir.1989), also recited this majority view without analysis, but did not directly rule on the issue.

of relationship driven by the entire financial picture as manifested in the course of payments, not just the latest payment).

Under the *Leathers* approach, new value in excess of the immediately preceding transfer cannot be applied to reduce the existing balance of prior preferential payments. The excess becomes a payment for which the creditor receives no offset credit. In other words, if the creditor ships goods worth $10,000.00, it would receive an offset against a $1,000.00 payment made the week before, but not against a $5,000.00 payment two weeks earlier. Application of the *Leather's* rule to the instant case illustrates its adverse impact on creditors: the Committee would be entitled to recover $18,656.01, twice its recovery under the *Garland* approach, because Bergen's third, fifth and sixth shipments during the preference period exceeded the value of the immediately preceding payments by about $9,000.00. Such a rule would encourage creditors to limit new shipments strictly to the amount of the prior invoice paid, regardless of the debtor's need for the new value infusion. Such an artificial legal distinction would interfere with the ordinary commercial flow of goods and services to troubled debtors.

The intended effect of Section 547(c)(4) is the equitable and commercially reasonable treatment of creditors who, following the receipt of a preference, have replenished the estate. *See, e.g., Meredith Manor, Inc., supra*, 902 F.2d at 259 (Section 574(c)(4) effectuates legislative objective of encouraging creditors to continue normal business relationships with financially troubled debtors); *In re Almarc Mfg., Inc.*, 62 B.R. 684, 688 (Bankr.N.D.Ill.1986) (key focus of Section 574(c)(4) is the fair treatment of creditors who after having received a preference have replenished estate); *In re Olympic Foundry Co.*, 51 B.R. 428, 431 (Bankr.W.D.Wash.1985) (Section 547(c)(4) is

designed to foster creditor relationships with troubled debtors). The *Garland* rule effectuates this policy by permitting subsequent advances of new value to reduce the immediately preceding preference as well as the balance of all prior preferences. The *Garland* subsequent advance rule has achieved majority status because, unlike *Leathers*, the rule comports not only with the language of the statute and Congressional intent, but also serves the legislative goal of encouraging creditors to maintain business relationships with financially troubled enterprises by recognizing the commercial realities of these transactions.

**D.** *Debtor's Payments are Credited as of Date of Delivery of Check.*

■ For purposes of Section 547(b), "transfers" by check are deemed made on the date that the check is honored by the bank. *Barnhill v. Johnson*, —— U.S. ——, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). But for the purposes of the new value and ordinary course defenses of Section 547(c), the Ninth Circuit adheres to the date of delivery rule, which treats the transfer as occurring upon delivery of the check to the payee, so long as the check is negotiated within a reasonable time thereafter. *See In re Wolf & Vine*, 825 F.2d 197, 200–02 (9th Cir.1987); *Shamrock Golf Co. v. Richcraft, Inc.*, 680 F.2d. 645, 646 (9th Cir. 1982); *In re Gold Coast Seed Co., supra*, 30 B.R. 551, 553 (BAP 9th Cir.1983)[6]. Thus, in analyzing the stream of payments and shipments between the debtor and Bergen for purposes of Section 547(c) defenses, this Court will deem the transfer date to be the date that Bergen received the check.

**E.** *Application of the Garland Subsequent Advance Rule.*

■ As discussed above, the *Garland* subsequent advance rule provides that each

---

**6.** A rarity: the circuit courts are unanimous on this issue. *See Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805 (5th Cir.1989); *In re Continental Commodities, Inc.*, 841 F.2d 527 (4th Cir. 1988); *In re White River Corp.*, 799 F.2d 631 (10th Cir.1986); *O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35 (1st Cir.1984). The Ninth

Circuit has not revisited the application of the transfer rule since the Supreme Court's decision in *Barnhill*. Without deciding the issue, *Barnhill* expressly noted that the rule on effective date of a transfer under Section 547(c) could logically differ from that under Section 547(b). —— U.S. at ——, 112 S.Ct. at 1391.

preferential transfer is avoidable until exceeded by subsequent advances of new value. If the amount of subsequent new value provided by the creditor exceeds a preferential transfer, the defense is complete as to that transfer. Surplus new value, however, cannot be used to offset later preferential transfers.

The chart below applies the subsequent advance rule to the payments made by Ladera to Bergen and Bergen's shipments to Ladera. Bergen has a new value defense that protects all but $9,583.18 of the debtor's transfers to Bergen during the preferential period.

| CHECK DATE | CHECK AMOUNT | GOODS SHIPPED | PREFERENCE |
|---|---|---|---|
| 11/15/89 | $12,318.81 | | $12,318.81 |
| | | $21,416.10 | 0.00 |
| 11/30/89 | 21,813.79 | | 21,813.79 |
| | | 9,752.18 | 12,061.61 |
| 12/15/89 | 11,644.11 | | 23,705.72 |
| | | 12,190.38 | 11,515.34 |
| 12/29/89 | 21,416.10 | | 32,931.44 |
| | | 14,821.70 | 18,109.74 |
| 1/15/90 | 9,752.12 | | 27,861.86 |
| | | 17,529.88 | 10,331.98 |
| | | 748.80 | 9,583.18 |
| **TOTAL** | $76,944.93 | $76,459.04 | $ 9,583.18 |

The first column is the date that Bergen received payments from Ladera for previously delivered supplies. The "Goods Shipped" column reflects the value of the supplies delivered by Bergen in between checks. The "Preference" column tallies the net avoidable preference outstanding after any new value is offset against the preceding preferential transfers. If the new value is greater than the preceding transfers, there is a net outstanding preference of of zero, and any difference is not carried forward. In contrast, when the new value is less than the prior transfer, then the difference is carried forward as a preference and added to a future transfer to create a net outstanding preference. The pending balance may then be reduced by the infusion of subsequent value.

For example, the amount of the check Bergen received on November 15th was less than the aggregate value of supplies that were delivered to Ladera after the November 15th check but before the November 30th check. The $21,416.10 in new value supplied by Bergen provides a complete defense to the $12,318.81 preferential transfer. Bergen receives no credit for the $9,097.29 value in excess of the payment received, however, because new value cannot be carried forward to offset *later* preferential transfers. In contrast, if the "net result" rule under former Section 60 of the Act were applied, this excess value would be credited: the sum of the checks paid would be netted against total shipments, yielding a preference recovery of only $485.89. On the other hand, if the majority rule were applied, Bergen would not be entitled to offset the first two shipments during this period, because it was paid $21,416.10 and $9,752.12 on account of those shipments on December 29th and January 15th respectively. Under the majority rule, the Committee would have recovered an additional $31,168.22.

## IV. CONCLUSION

The subsequent advance rule as articulated in *Garland* is the appropriate standard to be applied under Section 547(c)(4). Both motions for summary judgment are granted in part and denied in part. Bergen's infusion of new value provides a de-

fense to $67,361.75 of the $76,944.93 preferential transfers sought by the Committee, but the Committee is entitled to recover $9,538.18 in preferential transfers from Bergen that were not covered by subsequent advances.

This memorandum opinion constitutes this Court's findings of fact and conclusions of law. An appropriate order and judgment should be submitted forthwith by the Committee.