In re TRANSPORT ASSOCIATES,
INC., Debtor.

J. Baxter SCHILLING, Trustee-
in-Bankruptcy for Transport
Associates, Inc., Plaintiff,

v.

JACKSON OIL COMPANY, Defendant.

Bankruptcy No. 93–30016.
Adv. No. 93–3118.

United States Bankruptcy Court,
W.D. Kentucky.

June 9, 1994.

Mark Sandlin, Louisville, KY, for defendant Jackson Oil Co.

Baxter Schilling, Louisville, KY, for plaintiff/Trustee.

### MEMORANDUM–OPINION

J. WENDELL ROBERTS, Chief Judge.

This action is brought by the Chapter 7 Trustee of Transport Associates, Inc. ("Trustee") against Jackson Oil Company ("Jackson") to avoid as preferential transfers a total of $148,209.58 transferred by Transport Associates to Jackson in payment for petroleum products. This matter is presently before the Court on Jackson's Motion for Summary Judgment. Jackson advances two arguments in support of its Motion: (1) the payments were made in the ordinary course of business, and (2) Jackson gave new value following the transfers at issue. Having reviewed the Briefs filed by the parties, including Jackson's Reply and Trustee's Sur–Reply, this Court finds there are material facts in dispute and overrules Jackson's Motion.

### *FACTS*

On January 5, 1993, Transport Associates, Inc. ("Transport") filed a petition in bankruptcy under Chapter 7 of the Bankruptcy Code. Transport was in the business of selling petroleum products at the retail level through "truck stop" operations. Accordingly, as an ordinary part of Transport's business, it purchased petroleum products from various suppliers, including Jackson. At the outset of their business relationship in 1980, Jackson set up a credit account for Transport pursuant to the terms of which Transport was to pay Jackson's invoices within ten days of the date of each invoice. However, it is clear from the evidence in the record that early into their business relationship Jackson determined that Transport would be permitted to pay over a period extended significantly beyond the ten day period. From the evidence presented by the parties, it is not

possible for the Court to determine the exact period to which the payment terms were extended, as there is no evidence as to when Transport's checks were *received*. It is imperative for this Court to be presented with evidence as to when the checks were *received* by Jackson in order to analyze the evidence for purposes of Jackson's ordinary course of business defense and new value defense, pursuant to 11 U.S.C. § 547(c)(2) and (4).

Nevertheless, Jackson did supply this Court with a schedule of payments between the parties from July 7, 1992 to October 6, 1992 (the period of 90 to 180 days prior to the filing of Transport's bankruptcy petition). This schedule shows that of 45 payments totalling $278,444.79, 41 totalling $270,037.83 were posted by Jackson within 30 days of the invoice date. It appears from this evidence that a course of dealing was established whereby Transport was routinely permitted to pay Jackson within 30 days of invoice, presuming of course that Jackson is able to present evidence that the date it posted the checks was the same date it received them.

During the 90 day period preceding the filing of Transport's bankruptcy petition, Transport transferred to Jackson payments totalling $148,209.58. Of that total, $91,230.34 in payments (or 62%) were posted within 30 days of the invoice date. Additionally, Jackson continued to supply Transport with petroleum products throughout this period.

### LEGAL DISCUSSION

### I. SUMMARY JUDGMENT

In considering a motion for summary judgment, the question presented to this Court is whether there is "no genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court cannot try issues of fact on a Rule 56 motion, but is authorized to determine whether there are issues to be tried. *In re Atlas Concrete Pipe, Inc.,* 668 F.2d 905, 908 (6th Cir.1982). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court held that "in filing a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden; i.e., whether a jury could reasonably find either the plaintiff proved his case by the quality or quantity of evidence required by the law or that he did not." *Id.,* 477 U.S. at 254, 106 S.Ct. at 2513.

When ruling on a motion for summary judgment, the inference to be drawn from the underlying facts contained in the record must be viewed in a light most favorable to the party opposing the motion, in this case the Trustee. *Anderson,* 477 U.S. at 242, 106 S.Ct. at 2505. By granting summary judgment, the Court is concluding that based on the evidence upon which the nonmoving party intends to rely at trial, no reasonable fact finder could return a verdict for the nonmoving party. *Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985).

The moving party carries the initial burden of proof by informing the Court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. Once the moving party has produced such evidence, the nonmoving party must then direct the Court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. In other words, the nonmoving party, in this case the Trustee, must come forward with evidence establishing that it has a viable cause of action. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

In the present case, it is clear that there are material facts in dispute. Moreover, the Court does not at the present time have before it certain evidence which is critical to this court's analysis of both Jackson's ordinary course of business defense and new value defense, pursuant to 11 U.S.C. § 547(c)(2) and (4), respectively.

■ Most importantly, there is no evidence in the record with regard to the date that Jackson received the Transport checks at issue. The United States Supreme Court has held that for purposes of § 547(c), the

transfer of funds by check is effective on the date the creditor *received* the check, as long as Debtor's bank subsequently honors the check. *Barnhill v. Johnson,* —— U.S. ——, ——, 112 S.Ct. 1386, 1391, 118 L.Ed.2d 39 (1992). The *Barnhill* Court specifically distinguished between transfers for purposes of § 547(c) and transfers for purposes of determining whether a payment falls within the 90 day preference period under § 547(b). A transfer for purposes of § 547(c) occurs upon the creditor's *receipt* of the check, while a transfer for purposes of § 547(b) occurs when the check is *presented* to the bank. *Id.; accord Braniff Airways, Inc. v. Midwest Corp.,* 873 F.2d 805 (5th Cir.1989); *In re Continental Commodities, Inc. v. Smith Metal and Iron Co.,* 841 F.2d 527, 529–30 (4th Cir.1988); *In re Kroh Bros. Dev. Co.,* 930 F.2d 648, 650 (8th Cir.1991); *O'Neill v. Nestle Libbys P.R., Inc.,* 729 F.2d 35, 37–38 (1st Cir.1984); *In re White River Corp.,* 799 F.2d 631, 633–34 (10th Cir.1986).

This approach "encourages trade creditors to continue dealing with troubled businesses by insulating normal business transactions from the trustee's avoiding power." *Continental Commodities,* 841 F.2d at 530; *accord Braniff Airways,* 873 F.2d at 807. Moreover, it is more reflective of commercial realities as the commercial world customarily considers the receipt of a check the equivalent of a cash payment unless it is subsequently dishonored. *Continental Commodities,* 841 F.2d at 530; *White River,* 799 F.2d at 634; *In re Wolf & Vine,* 825 F.2d 197, 200 (9th Cir.1987).

Jackson has also failed to provide this Court with a calculation of its preference exposure that combines both the calculations of exposure under its new value defense, as well as its ordinary course of business defense. Jackson's Motion for Summary Judgment included a calculation of its preference exposure under its ordinary course of business defense. Jackson's Reply then provided a separate calculation of its preference exposure under its new value defense. Both calculations included all transfers that occurred within the 90 day preference period. There has been no attempt by Jackson to separate out the transfers that are entitled to the new

value exception from the transfers that are entitled to the ordinary course of business exception. Without such a designation, the end result would be a form of double dipping. The proper method of performing the calculation of preference exposure was a subject of great dispute between the parties' briefs, and will be discussed in detail subsequently.

## II. ORDINARY COURSE OF BUSINESS

■ Jackson asserts that the payments it received from Transport during the 90 day preference period were made pursuant to the ordinary course of business defense contained in 11 U.S.C. § 547(c)(2). For Jackson to prevail under 11 U.S.C. § 547(c)(2), three elements must be met:

(1) The underlying debt on which payment was made must have been "incurred in the ordinary course of business or financial affairs" of both parties;

(2) The transfer must have been "incurred in the ordinary course of business or financial affairs" between both parties; and

(3) The transfer must have been made "according to ordinary business terms" using an industry-wide test.

The Court does not at the present time have sufficient information before it to make a determination with regard to each of the prongs of this three-part test. Nevertheless, the Court will attempt to address the issues that it can given the evidence before it at this time.

## A. DEBTS WERE INCURRED IN THE ORDINARY COURSE OF BUSINESS OF BOTH PARTIES

There does not appear to be any dispute with regard to the fact that Transport's debts to Jackson within 90 days of the bankruptcy filing were incurred in the ordinary course of business of both parties. Transport routinely purchased petroleum products from Jackson on credit. Jackson then shipped the products to specified locations and invoiced Transport for the shipment. There does not appear to be anything extraordinary about how the debts were in-

curred. Thus, the first prong of the § 547(c)(2) test is satisfied.

### B. *WHETHER TRANSFERS WERE MADE IN THE ORDINARY COURSE OF BUSINESS BETWEEN THE PARTIES*

■ Trustee argues that Transport's and Jackson's ordinary course of business dealings required payment within 10 days due to the fact that the invoice set forth a 10 day payment term. This Court is not persuaded. It is clear from the evidence in the record that from early on in their business relationship, Jackson routinely permitted Transport to pay over a period significantly extended beyond the ten day term. However, as discussed above, without evidence as to when Jackson received Transport's checks it is not possible for this Court to determine the exact extent to which the payment terms were extended.

The Sixth Circuit has held on several occasions that if late payments were the standard course of dealing between parties, they shall be considered within the ordinary course of business under § 547(c)(2). *In re Yurika Foods Corp.*, 888 F.2d 42, 44 (6th Cir.1989) (Held that late payments were within the ordinary course of business between the parties where 87% of debtor's payments to creditor were made after the payment period specified in creditor's bills); *In re Fulghum Const. Corp.*, 872 F.2d 739, 742–43 (6th Cir. 1989) (Court applied the ordinary course of business exception of § 547(c)(2) where debtor made consistently late repayments to creditor of cash advances); *See also In re Fred Hawes Organization, Inc.*, 957 F.2d 239, 244 (6th Cir.1992).

■ In determining whether a particular payment practice was within the ordinary course of business between the parties, the Court is directed to consider "the business practices which were unique to the particular parties under consideration." *Fulghum*, 872 F.2d at 743. The Sixth Circuit has explained that "even if the Debtor's business transactions were irregular they may be considered ordinary for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Id.*

Accordingly, it appears from the evidence in the record that a course of dealing was established between the parties whereby Transport paid Jackson within 30 days of each invoice, presuming Jackson is able to present evidence that the date it posted the checks is the same date it received them. Hence, it appears that of the $148,209.58 transferred to Jackson during the 90 day preference period, $91,230.34 (or 62%) was transferred in accordance with the ordinary course of business between the parties.

### C. *WHETHER TRANSFERS WERE MADE ACCORDING TO ORDINARY BUSINESS TERMS USING AN IN-DUSTRY–WIDE TEST*

■ The third prong of the test involves whether the transfers were made according to ordinary business terms in the industry. This Court agrees with Jackson that the industry terms to be examined involve the customer credit policies of wholesale suppliers of petroleum products. According to the evidence in the record, the normal practice in the industry is to provide large, good credit customers with credit terms of 30 days for payment. Consequently, Jackson's apparent extension of the payment term to 30 days would be in accordance with the industry-wide custom.

Trustee's opposition to Jackson's ordinary course of business defense is based on the apparent co-mingling of funds in Transport's PNC bank account. In addition to its own funds, Transport placed two other type of funds into its general account at PNC: (1) funds belonging to a separate corporation, Transport Group, Inc.[1], and (2) employees' savings funds which were supposed to have been held by Transport in employees' savings accounts. It appears from the evidence that Transport used these co-mingled funds as its regular working capital. Accordingly,

---

1. Transport Associates and Transport Group, Inc. had common ownership. Both corporations were owned by William Tatter and his wife. Transport Group filed a petition in bankruptcy under Chapter 7 of the Code on the same day Transport Associates filed for bankruptcy.

the payments Jackson received came, at least in part, from these co-mingled funds. Trustee concedes, however, that at least some of the payments may have come from a line of credit provided by PNC bank that serviced both Transport Associates and Transport Group. There is presently no evidence in the record tracing the payments to Jackson from these various sources. Accordingly, this issue is not ripe for summary judgment as there would be absolutely nothing extraordinary or unusual with regard to payments made from a line of credit.

Moreover, this Court agrees with Jackson that Trustee's analysis appears to misapply the language in § 547(c)(2)(C) which examines whether a transfer was made according to "ordinary business *terms.*" The word "terms" is not defined in the Bankruptcy Code. However, it is defined in Webster's Dictionary as "conditions with regard to payments, price, rates and other related matters." The U.C.C. § 1–201(42) defines "term" as "portion of agreement which relates to a particular matter." It does not appear to this Court that Transport's banking practices with PNC bank are relevant with regard to the business terms involved in transfers between Jackson and Transport, or with the business terms in the industry.

This Court furthermore agrees with Jackson that it is not reasonable to expect a non-insider creditor, such as Jackson, to inquire into a debtor's internal banking practices. As a supplier and an unsecured creditor, Jackson was not privy to the banking and accounting practices of Transport, and could not have been aware of Transport's co-mingling of bank accounts.

Trustee cites *First Federal of Michigan v. Barrow*, 878 F.2d 912 (6th Cir.1989), for the proposition that payment of bills from co-mingled funds is inconsistent with normal business practices in the industry. The *Barrow* case is, however, distinguishable from the facts involved in this case based upon the evidence currently in the record. In the *Barrow* case, the debtors, Salem Mortgage Company, Fidelity Fund, Inc., Fidelity Securities Corporation, Nationwide Mortgage Company, Inc., and Mutual Mortgage Company acted collectively through Salem Mort-

gage Company, the principal alter ego of the debtors' CEO, Joseph Steingold. *Id.* at 913–14. Salem Mortgage Company was set up to act as the paid servicing agent between investors who loaned mortgage funds and the mortgagors who made monthly payments to the investors. *Id.* The debtors collected the monthly mortgage payments and held them in trust in separate escrow accounts. From these segregated funds, the debtors paid taxes and insurance on the mortgaged property, and sent a regular "dividend" check to their investors. *Id.* Subsequently, the debtors co-mingled the trust accounts with their general operating account, which was used as the daily operating capital. *Id.* As the debtors' financial situation became precarious, Mr. Steingold began to fraudulently divert these funds "to certain favored creditors and appellants herein on behalf of selective investors." *Id.* at 914. The preferred investors, who benefitted from the debtors' payments were quasi-insiders who were paid from the last of the debtors' converted funds. The *Barrow* Court found that the debtors had engaged in intentional, fraudulent and illegal conduct. *Id.* at 917–18. The Court stated that the debtors had not made payments in the ordinary course of business due to "totally unorthodox and illegal" activity combined with the debtors' "scheme to defraud" which was a result of "pre-bankruptcy planning." *Id.* at 917–19.

In this case, there is not sufficient evidence at this time to support a finding that Transport engaged in illegal activity or a scheme to defraud. Moreover, unlike the recipients of the alleged preferential transfers in the *Barrow* case, Jackson was not an insider, quasi-insider, or investor in the Transport business. Accordingly, the *Barrow* case is not controlling given the evidence in the record at this time.

## III. *NEW VALUE*

■ Jackson secondly asserts that it advanced $68,649.11 in petroleum products to Transport within 90 days of the bankruptcy filing, none of which was paid for by Transport. Jackson, at pages three and four of its Reply Brief, has provided this Court with a calculation of its preference exposure when

utilizing the new value defense set forth in 11 U.S.C. § 547(c)(4). This calculation shows Jacksons's total preference exposure to be $79,560.47.

The Court will again reiterate at this juncture that without evidence as to when Jackson *received* the checks at issue, it is not possible for the Court to properly analyze Jackson's subsequent new value defense. Nevertheless, the Court will address the legal issues raised by the parties.

## A. NEW VALUE IS NOT AN EXCLUSIVE DEFENSE

■ Trustee cites *In re Check Reporting Services, Inc.*, 140 B.R. 425, 437 (Bankr. W.D.Mich.1992), for the proposition that the new value defense is an exclusive defense and may be used only if the creditor waives all other § 547(c) defenses. This Court has reviewed the *Check Reporting Services* case and finds that it in no way stands for such a proposition. To the contrary, the case expressly recognizes a creditor's right to assert *both* the ordinary course of business defense, as well as the new value defense. *Id.* at 432 and 440. In the *Check Reporting Services* case, the creditor asserted the new value defense, while reserving the right to assert additional § 547(c) defenses at some undetermined time in the future. The Court simply held that the appropriate calculations could not be made unless all the defenses were either presently before the Court, or unless the creditor would agree to stipulate that no other defenses would be asserted. *Id.* at 437–38. The calculations need to be performed at the same time with a designation as to which defense is to be applied to the various transfers in order to prevent double dipping by the creditor.

Accordingly, Jackson is not precluded from asserting both the ordinary course of business defense, as well as the new value defense.

## B. METHOD FOR CALCULATING JACKSON'S PREFERENCE EXPOSURE UNDER THE § 547(C)(4) NEW VALUE DEFENSE

■ The method for calculating Jackson's preference exposure under the § 547(c)(4) is apparently the subject of much dispute between the parties. Both parties seem to agree, however, that to be eligible for the new value defense, § 547(c)(4) requires the creditor's transfers of new value to be *subsequent* to the debtor's preferential payments. *In re Fulghum Const. Corp.*, 872 F.2d 739, 742 (6th Cir.1989); *In re Fabric Buys of Jericho, Inc.*, 22 B.R. 1013 (Bankr. S.D.N.Y.1982). Section 547(c)(4) is a "subsequent advance" rule. *Fulghum Construction Corp.*, 872 F.2d at 742. It protects a transfer from preference attack to the extent that a creditor *thereafter* replenishes the estate. *In re Meredith Manor, Inc.*, 902 F.2d 257 (4th Cir.1990); *In re IRFM, Inc.*, 144 B.R. 886 (Bankr.C.D.Cal.1992). Accordingly, the proper mode of assessment requires that after each preferential payment, a determination be made as to how much new value the creditor restored to the debtor before the next preferential payment was made. *Meredith Manor*, 902 F.2d at 258–25; *In re Ladera Heights Community Hosp., Inc.*, 152 B.R. 964, 967–69 (Bankr.C.D.Cal.1993).

■ The parties disagree, however, with regard to whether the new value given by the creditor is to be netted *only* against the *one immediately preceding* preference, or whether it is to be netted against all prior preferences. Trustee cites *Leathers v. Prime Leather Finishes Co.*, 40 B.R. 248 (D.Maine 1984), for the proposition that the new value is to be netted only against the immediately preceding preference. This approach has been criticized by the majority of courts which have considered this issue for its arbitrary refusal to permit set-off against earlier transfers. *Meredith Manor*, 902 F.2d at 259; *Ladera Heights Community Hosp.*, 152 B.R. at 967–69; *IRFM*, 144 B.R. at 890–92; *In re M & L Business Mach. Co., Inc.*, 160 B.R. 851, 855–56 (Bankr.D.Colo.1993). This Court agrees with the majority position on this issue in adopting what has become known as the "Garland approach," as it was first articulated in *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982). This method permits each advance of "new value" to be used to offset all prior preferences, not limited to only the one immediately preceding preference. *Meredith Manor*,

902 F.2d at 259; *Check Reporting Services,* 140 B.R. at 431–40; *Ladera Heights Community Hosp.,* 152 B.R. at 967–69; *M & L Business Mach. Co.,* 160 B.R. at 855–56. The creditor, in this case Jackson, is thus allowed "to apply the giving of new value against the immediately preceding preference as well as against all prior preferences." *Meredith Manor,* 902 F.2d at 259.

This approach better serves the legislative goal of encouraging creditors to continue doing business with financially troubled debtors. *Id.* In comparison, the *Leathers* approach, advocated by Trustee, would discourage creditors from advancing new value in excess of the amount of the prior invoice paid, regardless of debtor's need for an infusion of new value. *Ladera Heights Community Hosp.,* 152 B.R. at 969. "Such an artificial legal distinction would interfere with the ordinary commercial flow of goods and services to troubled debtors." *Id.*

Moreover, the "Garland approach" adopted by this Court reflects a more realistic view of commercial practices. As explained by the Fourth Circuit:

> "An open credit line is a fluid relationship which normally does not emphasize individual loan repayments. Instead, it is the debtors' entire financial picture and repayment, which are the basis for maintaining the line of credit."

*Meredith Manor,* 902 F.2d at 259.

Finally, in calculating its preference exposure under both the § 547(c)(1) ordinary course of business defense and the § 547(c)(4) new value defense, Jackson must provide this Court with an analysis that correlates both defenses. Jackson must calculate its preference exposure on an item by item basis. All preference payments should be set forth in chronological order, according to when Jackson received each check. Then Jackson must perform its calculations of preference exposure on a transaction by transaction basis, designating which payments are entitled to the new value set off and which are entitled to the ordinary course of business exception to preference exposure.

### CONCLUSION

For the above stated reasons, this Court, by separate Order, finds there are material facts in dispute and overrules Jackson Oil Company's Motion for Summary Judgment.

### ORDER

Pursuant to the attached Memorandum–Opinion,

IT IS HEREBY ORDERED that Defendant, Jackson Oil Company's Motion for Summary Judgment be, and hereby is OVERRULED.

This is final and appealable Order, and there is no just cause for delay.